UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X   Case No.
ALLISON WEAVER

**COMPLAINT**

Plaintiff,

**PLAINTIFF DEMANDS**
-against-   **A TRIAL BY JURY**

BLOOMBERG, L.P.

Defendant.
------------------------------------------------------------------------X

Plaintiff, ALLISON WEAVER ("Plaintiff" or "Weaver"), by her attorneys, PHILLIPS & ASSOCIATES, PLLC, hereby complains of the Defendant, BLOOMBERG L.P. ("Defendant" or "Bloomberg") as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to **Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the **New York State Human Rights Law**, NYS Executive Law § 296, *et seq*. ("NYSHRL"), and the **New York City Human Rights Law,** New York City Administrative Code § 8-107(1), *et seq.* ("NYCHRL")*,* and seeks damages to redress the injuries Plaintiff has suffered as a result of being **discriminated and retaliated against** and subjected to **unlawful disparate treatment** and a **hostile work environment** by Defendant due to her **race and color**.

2. Plaintiff additionally complains pursuant to the **disability** discrimination provisions of the **NYSHRL** and **NYCHRL** that Defendant **discriminated against** her by terminating her employment shortly after she returned from medical leave for anxiety and depression created by the aforementioned hostile work environment.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is proper under 42 U.S.C. §12101, *et seq*. and 28 U.S.C. §§ 1331

and 1343.

4. The Court has supplemental jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this district in accordance with 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of New York.

## PROCEDURAL PREREQUISITES

6. Plaintiff filed a Charge of Discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

7. Plaintiff received a Notice of Right to Sue from the EEOC, dated June 28, 2022, concerning the herein charges of discrimination. A copy of the Notice is annexed hereto.

8. This Action is being commenced within ninety (90) days of receipt of said Notice of Right to Sue.

## PARTIES

9. Plaintiff at all relevant times herein was and is a resident of the State of New York.

10. At all relevant times herein, Plaintiff was and is a "person" and an "employee" entitled to protection by relevant federal, state, and city laws referenced herein.

11. Defendant is a foreign limited partnership duly organized under the laws of the State of Delaware.

12. Defendant operates various principal offices in New York City, including but not limiting to, an office located at 120 Park Avenue, New York, New York (the "Principal Office").

13. At all relevant times herein, Defendant "employed" at least fifteen (15) employees.

14. Thus, Defendant is an "employer" within the meaning of the relevant statutes referenced herein.

15. At all relevant times herein, Plaintiff was an employee of Defendant and worked in-person at the Principal Office.

## FACTUAL ALLEGATIONS

16. On or about February 5, 2018, Weaver, a Black female, was hired as a network communications representative by Defendant.

17. In her role for Defendant, Weaver managed Defendant's various telephone carriers and vendors, including by overseeing pricing, design and installation of customer connectivity products.

18. At all relevant times herein, Weaver earned approximately ninety thousand dollars ($90,000) per year as an employee for Defendant.

19. Throughout Weaver's employment with the Defendant, her performance met or exceeded the Defendant's legitimate expectations.

20. However, Defendant endorsed a campaign of discrimination and retaliation against Weaver beginning in or around February 2018.

21. In 2018 and thereafter, Weaver's supervisors at the Principal Office included her team lead – Jason Kaufman ("Kaufman") – and Defendant's regional manager – Miguelina Rios ("Rios").

22. Both Kaufman and Rios possessed authority to effectuate personnel decisions on behalf of Defendant, including relating to Weaver's employment status.

23. However, commencing in Weaver's first weeks of employment with Defendant, Kaufman and Rios conspicuously committed hostile acts and demonstrated antagonistic behavior towards Weaver because of her race and color.

24. With respect to Rios, employees of Defendant had previously complained of her discriminatory conduct which went unremedied by Defendant for many years, including, at all relevant times herein.

25. Otherwise, in or around February 2018, Defendant discriminated against Weaver by denying her certain compensatory benefits to account for her move to New York City in order to work for Defendant.

26. In fact, under Defendant's policies and procedures, Weaver qualified for certain compensatory benefits based on her move.

27. Further, Defendant had an established practice of previously providing company housing to other white employees that were similarly situated to Weaver in that they moved New York City to work for Defendant.

28. Ultimately, Defendant denied Weaver the option of company housing and other compensatory benefits because she was Black.

29. In addition, Defendant enacted other policies, procedures and practices which discriminated against Black employees.

30. For instance, while Weaver was onboarding and performing mandatory training for Defendant in or around February 2018, she was refused help from Kaufman and Rios.

31. Instead, Weaver was forced to compile her own training materials.

32. Defendant and its staff refused to properly train Weaver because she was Black.

33. As a result, Weaver was forced to learn how to excel in her role for Defendant on her own.

34. On the contrary, when a white colleague joined Weaver's team in 2019, that white employee received one-on-one trainings and daily assistance from Weaver's managers.

35. Indeed, Weaver's team trained and materially assisted Weaver's white colleague so that he could excel at his job functions for Defendant.

36. Unlike in Weaver's case, further, the white colleague was even taken to lunch by Rios and Kaufman to assess how he was acclimating to his role with Defendant.

37. Significantly, after onboarding, Weaver's white colleague was awarded special projects to work on.

38. Weaver's white colleague was awarded special projects because of his race and color and denied to Weaver because of her race and color, irrespective of Weaver's seniority or superior set of skills to manage the special projects on behalf of Defendant.

39. Though Weaver voiced a desire to work on the special projects and advance within Defendant's organization – at all relevant times herein – Weaver was denied working on special projects and held back within the organization due to her race and color.

40. As a result, the special projects awarded to Weaver's white colleague allowed him to showcase his skills and obtain intimate facetime with senior regional and global leaders.

41. Additionally, Weaver's white colleague was sent for training that Weaver had previously requested and was denied. In fact, the training took place while Weaver was on medical leave.

42. Upon information and belief, the training that Weaver was denied would have allowed her to earn more certifications and a higher salary.

43. In turn, Defendant's disparate treatment enhanced the potential for Weaver's white colleague to advance within Defendant's organization while Weaver was left behind and stuck in her role.

44. Around this time, Defendant not only discriminated against black employees (including Weaver) to "prop up" their white counterparts, but also created a hostile work environment in which team leaders purposefully tried to sabotage Black employees' job statuses.

45. With respect to Weaver, for instance, Rios commanded Weaver present a three (3) hour long presentation summer interns, in or around July 2020, in an obvious attempt to sabotage Weaver's work performance for Defendant.

46. Specifically, when Weaver asked Rios for the necessary specifications for a successful presentation, Rios refused to provide any feedback or comments.

47. Nor did Rios inform Weaver as to how the presentation was to be outlined, prepared, or delivered to the summer interns.

48. On the date of the presentation, Weaver was required to present all three (3) hours exclusively by herself while other similarly situated, white employees, presented for only one (1) hour.

49. Additionally, other similarly situated white employees presented to summer interns with the benefit of having prior approval from their manager and team leads, in addition to feedback, comments, and specific directions.

50. In sum, Rios discriminated against Weaver by singling her out to present all three (3) hours without feedback or direction of any kind.

51. Thereafter, Defendant continued to discriminate and retaliate against Weaver on the basis of her race and color.

52. In particular, Defendant's staff routinely re-assigned Weaver's internal business clients and vendors in order to ensure she would fail at her essential job functions for Defendant.

53. For instance, in or around February 2018, Weaver worked with and serviced an outside vendor, AT&T.

54. Without explanation, in or around February 2019, Defendant reassigned AT&T from Weaver's exclusive management to a white co-worker.

55. Upon information and belief, Weaver's metrics were directly correlated to the vendors' performance, meaning, if the vendor poorly performed, so would Defendant's employee.

56. Subsequently, Weaver was assigned the most problematic vendor of Defendant, CenturyLink/Lumen, in an effort to negatively impact Weaver's metrics.

57. Upon information and belief, CenturyLink/ Lumen had a reputation of being a poor performing vendor.

58. After approximately one (1) year of successfully managing and improving the CenturyLink/Lumen relationship, Defendant yet again reassigned Weaver to a new vendor.

59. In or around February 2020, Defendant's removed Century Link/Lumen's account from Weaver's vendor list and assigned her Verizon, another problematic vendor.

60. Verizon was reassigned by Defendant to Weaver in another attempt to adversely impact her performance metrics on behalf of Defendant.

61. Weaver was assigned – Verizon– during the middle of a major power outage experienced by Defendant.

62. Defendant knew that when reassigning Verizon to Weaver, it would be increasingly difficult for Weaver to meet Defendant's expectations in servicing the vendor.

63. Indeed, at the time, due to the major power outage, Weaver was flooded with a colossal influx of project tickets associated with Verizon, which required Weaver to navigate a myriad of highly complicated issues during a period of crisis.

64. When Weaver was working towards resolving the issues in the project tickets for Verizon, Rios reprimanded and threatened Weaver in an effort to humiliate her in front of the entire department.

65. Specifically, Rios complained in front of the entire team that Weaver inputted incorrect updates for Verizon, which was untrue.

66. Rios purposefully criticized Weaver because of Rios's animus towards Black employees of Defendant which was uninvestigated, unacknowledged and unremedied by Defendant for many years.

67. Though Weaver tried her best to service all of the outside vendors – as part of her job duties – Defendant continuously assigned Weaver poor performing vendors in order to sabotage Weaver's performance metrics and "set up" a legitimate business justification for adverse action against her.

68. In addition to the reassignment of poor performing client/vendors to Weaver's account, Defendant discriminated against Weaver by singling out her performance and criticizing her work product in front of her co-workers.

69. Other white employees on Weaver's team were not singled out, criticized or reprimanded in front of others.

70. Rather, Rios not only regularly praised Weaver's white colleagues but also defended them from criticism when they made obvious mistakes.

71. Finally, Defendant also discriminated against Weaver by concocting false allegations relating to Weaver's work performance in bi-yearly performance evaluations/reviews.

72. Throughout Weaver's employment with Defendant, her bi-annual performance evaluations contained falsities regarding her work performance or otherwise relied on pretextual, discriminatory criticisms rooted in Defendant's assignment of poor performing vendors to Weaver.

73. These falsities were endorsed by Kaufman and Rios on behalf of Defendant in order to discriminate against Weaver on the basis of her race and color.

74. Nevertheless, Weaver repeatedly refused to endorse the bi-annual performance evaluations.

75. Instead, Weaver highlighted and complained throughout her employment that the performance evaluations were rooted in discriminatory practices by Defendant on the basis of Weaver's race and color.

76. With respect to the discriminatory and hostile work environment to which Weaver was subjected, Weaver complained to Defendant's staff regarding discrimination against her on various occasions throughout her employment with Defendant.

77. Weaver complained to representatives in Human Resources (Chris Michel, Michele Ceran, Katherine Polis, Maryanne Ravenel) and others team leaders for Defendant – Aurora Achong ("Achong") and Irene Adepoju ("Adepoju") – in every year of her employment with Defendant.

78. With respect to Weaver's complaints to Achong and Adepoju – Black managers for Defendant – they collectively admitted to Weaver that Rios was discriminating against Weaver on the basis of her race and color.

79. Achong and Adepoju specifically admitted that Rios had a history of discrimination against Black employees of Defendant.

80. They further detailed similar institutional issues of unremedied discriminatory conduct by Defendant's staff, in addition to past examples of disparate treatment against black employees.

81. Adepoju admitted that the bi-annual performance reviews were a product of pretext and discrimination against Weaver because she was Black.

82. Indeed, Adepoju reviewed Weaver's underlying work product and related performance reviews in tandem to reach the conclusion that Defendant's negative evaluations were unwarranted, untrue and a product of discriminatory behavior.

83. Achong even indicated to Weaver that Rios was "actively trying to get rid of her."

84. Achong also encouraged Weaver to separate from Defendant and seek "work elsewhere".

85. In January 2021, shortly after Weaver's complaints to Achong in late 2020, Defendant placed Weaver on a performance plan, which was to last for six (6) months.

86. Though Weaver complained to colleagues and managers of Defendant throughout her employment, she formally complained to Human Resources for Defendant in or around July 2021.

87. In response, Human Resources confirmed there was merit to Weaver's complaint that she was being treated differently.

88. Human Resources communicated to Weaver "something would be done" to remedy the hostile work environment against her.

89. However, neither Human Resources nor Defendant ever followed-up with Weaver to acknowledge the racial discrimination against her, let alone investigate or remedy the hostile work environment led by Defendant's management against Weaver.

90. Around the same time, July 2021, Weaver took medical leave from work as a result of anxiety and depression she had begun to suffer due to her work environment.

91. Indeed, around the time she began leave, Weaver informed Achong that the leave was because of mental health issues stemming from the discrimination that she faced at work.

92. In late August 2021, Weaver returned to work from medical leave. Upon her return to work, Achong informed her that although she had met all expectations of and performed well under the January 2021 performance plan, she would need to remain on the plan for an additional six (6) months.

93. Thereafter, Defendant retaliated against Weaver by reassigning a poor performing vendor – Zayo – to Weaver's account.

94. There was no legitimate business reason to reassign another poor performing vendor to Weaver.

95. Nonetheless, Weaver performed well under these constraints and Achong consistently advised Weaver at their weekly meetings that she was performing well.

96. However, on or about December 6, 2021, Defendant terminated Weaver's employment.

97. There was no business justification for terminating Weaver's employment.

98. Further, Weaver's performance reviews – which were untrue and the product of discriminatory pretext based on Weaver's protected characteristics – were relied on by Defendant to terminate Weaver's employment and concoct a sham business justification for termination.

99. Significantly, around the time of her termination, Weaver had interviewed for a role with Defendant's news team.

100. This interview was granted because Weaver was meeting Defendant's expectations and performing up to par for Defendant.

101. Significantly, Weaver was offered a role with the news team on or about November 2021. Indeed, Achong even advised Defendant's Human Resources department to remove Weaver from the performance plan to allow the transfer to the news team.

102. Nevertheless, rather than allow Weaver to remain within Defendant's organization and excise Weaver from Rios's and discriminatory management, Defendant retaliated against Weaver by terminating her employment and taking other adverse actions against her.

103. At the same time, Defendant purposefully failed to investigate, acknowledge or remedy any of the discriminatory and retaliatory conduct described herein.

104. As a direct result of the wrongful and oppressive actions of Defendant and its staff, Weaver was subjected to unlawful discrimination, humiliated and experienced a hostile work environment causing her embarrassment, discriminatory ridicule, and hostility, in addition to increased anxiety and mental and emotional trauma.

105. As a result of the Defendant's actions, Weaver was unlawfully treated, humiliated, degraded, victimized, embarrassed, and emotionally distressed.

106. As a result of the acts and conduct complained of herein, Weaver has suffered a loss of income by way of her separation from Defendant, the loss of salary/pay, special damages, loss of employment, loss of employment opportunities, loss to benefits and other compensation which such employment entails.

107. Weaver has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

108. As a result of the acts and conduct complained of herein, Weaver has suffered and will continue to suffer emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Weaver has further experienced severe emotional and physical distress.

109. Defendant's conduct was malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Weaver demands Punitive Damages as against Defendant.

## FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

110. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

111. 42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

112. As described herein, the Defendant discriminated against Plaintiff on the basis of her race and color in violation of Title VII by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included,

among other things, pervasive harassment of Plaintiff after internal complaints were made by Plaintiff to various supervisors of Defendant regarding discrimination against her.

113. As a result of the unlawful discriminatory conduct of the Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

114. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SECOND CAUSE OF ACTION
## FOR RETALITION UNDER TITLE VII

115. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

116. 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

117. As described herein, Plaintiff engaged in protected activities, including but not limited to, making internal complaints regarding discrimination and retaliation to the Human Resources department of Defendant and Defendant's staff.

118. As described herein, after Plaintiff engaged in activities protected by Title VII, the

14

Defendant took adverse actions against Plaintiff which would cause a reasonable employee from making or supporting a similar complaint of discrimination.

119. Following Plaintiff's complaints, Plaintiff was subjected to an increasingly worse hostile environment permeated with discriminatory ridicule, harassment, unwarranted comments, insults, adverse employment actions, and other retaliatory behavior.

120. As a result of Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

121. Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NYSHRL

122. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

123. Executive Law § 296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate

15

        against such individual in compensation or in terms, conditions or privileges of employment.

124. As described herein, Defendant discriminated against Plaintiff on the basis of her race and color in violation of NYSHRL, by subjecting her to disparate treatment and creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a work environment which was filled with harassment, discriminatory and retaliatory conduct against her.

125. As described herein, Defendant also discriminated against Plaintiff on the basis of her disability or perceived disability in violation of the NYSHRL, by terminating her employment.

126. As a result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which he is entitled to an award of monetary damages and other relief.

127. As a result of Defendant's unlawful discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

128. Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE NYSHRL

129. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

130. Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

131. As described herein, Plaintiff engaged in protected activities, including but not limited to, voicing, drafting and filing internal complaints regarding discrimination on the basis of her race and color.

132. As described herein, after Plaintiff engaged in activities protected by the NYSHRL, Defendant took adverse employment actions against Plaintiff that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

133. As a result of Defendant's retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

134. Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NYCHRL

135. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

136. New York City Administrative Code §8-107(1) provides that It shall be an unlawful discriminatory practice:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

137. Defendant engaged in an unlawful discriminatory practice in violation of the New York City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, a toxic work culture, a hostile work environment, and otherwise discriminating against Plaintiff because of her race and color.

138. As described herein, Defendant also discriminated against Plaintiff on the basis of her disability or perceived disability in violation of the NYCHRL, by terminating her employment.

139. Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SIXTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE NYCHRL

140. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint as if more fully set forth herein at length.

141. The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

142. Defendant engaged in an unlawful discriminatory set of practices in violation of the NYCHRL by discriminating and retaliating against Plaintiff for his opposition to the unlawful employment practices of the Defendant and making internal complaints regarding discrimination and retaliation against her.

143. Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

144. Plaintiff hereby demands a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII, the New York State Human Rights Law, and the New York City Human Rights Law, in that Defendant discriminated against Plaintiff on the basis of her race and color and disability, and subjected her to a hostile work environment permeated with harassment and retaliatory conduct against her in addition to disparate treatment based on her protected classes;

B. Awarding damages to Plaintiff resulting from Defendant's unlawful practices, and to otherwise make her whole for any losses suffered as a result of such unlawful employment

19

practices, including but not limited to, loss of benefits as a result of Plaintiff's termination;

C. Awarding Plaintiff compensatory damages related to injuries suffered as per Plaintiff's federal, state, and city-law claims;

D. Awarding Plaintiff compensatory damages for mental, emotional and physical injuries, distress, pain and suffering and injuries to his reputation in an amount to be proven;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: Garden City, New York
September 26, 2022

                                     **PHILLIPS & ASSOCIATES,**
                                     **ATTORNEYS AT LAW, PLLC**

                                     _____/s/_____
                                     Marjorie Mesidor
                                     Joseph Myers
                                     585 Stewart Avenue, Suite 410
                                     Garden City, New York 11530
                                     T: (212) 248-7431
                                     F: (212) 901-2107
                                     mmesidor@tpglaws.com
                                     jmyers@tpglaws.com