UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALLISON WEAVER,

                                        Plaintiff,

                    -v-

BLOOMBERG L.P.,

                                        Defendant.

22 Civ. 8201 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Allison Weaver, a Black woman, alleges here that her former employer, defendant Bloomberg L.P., fired her because of her race. She brings disparate treatment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law § 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a) *et seq.* ("NYCHRL").

Pending now is Bloomberg's motion for summary judgment on all claims. For the reasons that follow, the Court denies the motion.

## I.    Background[1]

### A.    Facts

#### 1.    2017: Weaver's Hiring

In October 2017, Weaver, then living in Chicago, applied for a role with Bloomberg's network communications team (the "Team") in its New York office. JSF ¶¶ 3, 6. The Team

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, the parties' joint statement of undisputed facts ("JSF"), Dkt. 28; Bloomberg's Rule 56.1 statement, Dkt. 38 ("Def. 56.1"); the declarations in support of the motion, plus attached exhibits, of Aurora Achong, Dkt. 32 ("Achong Decl."), Deborah Barker, Dkt. 33 ("Barker Decl."), David W. Garland, Dkt. 34

handles technical "procurement and implementation" for Bloomberg, which operates "one of the largest private telecommunications networks in the world." JSF ¶ 1.  Before being hired, Weaver was interviewed by several members of the Team's management staff, including Miguelina Rios, network communications regional manager for the Americas.  JSF ¶ 4.  Rios recommended that Bloomberg hire Weaver, JSF ¶ 5, which Bloomberg did, JSF ¶ 6.

### 2.      2018–2019: Weaver's First Manager

On February 5, 2018, Weaver began work as a telecommunications representative in Bloomberg's New York office.  JSF ¶ 6.  At the time, her direct manager was team lead Jason Kaufman.  JSF ¶ 8.  Kaufman, in turn, reported to Rios.  JSF ¶ 9.

Within several months, issues arose regarding Weaver.  On July 31, 2018, Kaufman wrote to Laura Jenkins, a Bloomberg human resources ("HR") employee, to discuss Weaver's performance.  Def. 56.1 ¶ 1.  She "has been having issues with coming in during her regularly scheduled hours," Kaufman wrote, "and has had to work late as a result." Rios Decl., Ex. 1 at 2. He continued:

---

("Garland Decl."), Katherine Polis, Dkt. 35 ("Polis Decl."), and Miguelina Rios, Dkt. 36 ("Rios Decl."); the declarations in opposition to the motion, plus attached exhibits, of Alison Weaver, Dkt. 41 ("Weaver Decl."), and Joseph Myers, Dkt. 42 ("Myers Decl."); and the declaration in further support of the motion, plus attached exhibits, of David W. Garland, Dkt. 44 ("Garland Supp. Decl.").  The transcripts of various depositions are cited herein, including those of Miguelina Rios, Garland Decl., Ex. 2 ("Rios Dep."); Aurora Achong, which appears in part in Garland Decl., Ex. 3, and in part in Myers Decl., Ex. 8 ("Achong Dep."); and Allison Weaver, Myers Decl., Ex. 1 ("Weaver Dep.").  For exhibits with both internal and Bates-stamped numbering, the Court cites the Bates-stamped page numbers.

Citations to Bloomberg's Rule 56.1 statement incorporate by reference the documents cited therein.  Because Weaver did not file an opposition to Bloomberg's Rule 56.1 statement, the Court deems the facts set forth in Bloomberg's Rule 56.1 statement undisputed for purposes of this motion, as such are supported by admissible evidence. *See* Fed. R. Civ. P. 56(e)(2); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." (citation omitted)).

Her performance as a result and ability to work with our vendors and customers who work the 8-5 hours she is scheduled for has been impacted. I have already spoken to her on two occasions about needing to be in on time and her commute should allow her to be her [sic] without consistent lateness. I will be speaking formally with her about this and it will be documented as part of our discussion during the mid-year evaluation.

Secondly, she needs to improve her ability to do the core role without oversight such as ticket updates, proactive monitoring of telecom orders, etc., which she is not up to par on at this time. This will also be another topic documented in the mid-year evaluation. This is another issue that we've discussed in her 1v1's and has been also communicated via [online] conversations when [Rios] or myself have needed to follow up on ticket updates required of her.

*Id.*

In August 2018, Weaver received her 2018 interim performance evaluation, which chronicled similar issues. JSF ¶ 14. She "has progress to make as a COMMS rep," Kaufman wrote, "but I believe that she has all of the tools needed to be successful here." Garland Decl., Ex. 6 at 4. He added that Weaver "must continue to improve as the year goes on," in particular in "us[ing] the information at her disposal to make decisions . . . instead of asking for direction," "[i]ncreasing her subject matter knowledge," "[m]anaging various queues" of ticket requests and "understanding the priority of different items," and "[a]ctioning projects in a timely manner." *Id.* at 1–3.

At "the end of 2018," Kaufman and Rios met with Weaver to discuss her performance. Weaver Dep. 80. In Weaver's words, Kaufman "communicated that I was not meeting their expectations," which Rios then reiterated. Weaver Dep. 81–82. Weaver's self-evaluation acknowledged that she needed to "learn to prioritize the issues from my colleagues" and "to be cognizant of how much time I'm spending in my queues or on a particular issue." Garland Decl., Ex. 7 at 5.

In mid 2019, matters escalated.  On June 12, 2019, Kaufman delivered a verbal warning to Weaver about her performance, which he memorialized in an email sent to her that same day. JSF ¶ 16. He listed three areas as "requir[ing] immediate improvement":

> 1) Ticket management - tickets should be kept up to date, with relevant stakeholders aware of status.  [Tickets] should be updated as needed, deferred out, and closed out when task is resolved.  [Orders] should be updated in a timely manner (responding to vendor and/or BOS in 48 hours or less).

> 2) Urgency/priority - actions must be taken to resolve issues sooner to ensure we can deliver service to our clients (or internal customers) in a quicker manner.  In the case of when you were out on vacation - we were impacted by our ability to act on some orders due to a lack of clear direction being given prior to you leaving.

> 3) Procedural knowledge - as a member of the team who is more senior by tenure, it is expected that you follow departmental processes and uphold them when dealing with other groups.  For example, you completed two orders in Columbus without testing the circuits because NETS advised us to do so.

Polis Decl., Ex. 1 at 2.

In August 2019, Weaver received her 2019 interim performance evaluation, pursuant to which she was placed on a performance improvement plan (a "PIP").  JSF ¶¶ 17, 19.  In the evaluation, Kaufman explained to Weaver that "[t]his is a warning to you regarding continuing areas of serious concern with your performance, as you are currently not meeting department standards."  Garland Decl., Ex. 9 at 3.  "I am especially concerned," he wrote, "with the consistency of your work, your understanding of the technical needs of our industry, and ability to manage process and projects."  *Id.*  "If you fail to follow the procedures outlined in this memorandum," he concluded, "you may be subject to further action, up to and including termination of your employment."  *Id.* at 4.

In late 2019, progress was reported.  On September 30, 2019, Kaufman emailed Katherine Polis—another HR employee—that Weaver had been "able to maintain the expected level of performance without much oversight" while he was away.  Polis Decl., Ex. 3 at 5.  On

October 2, 2019, he confirmed that Weaver's performance had "been consistent since the mid-year," and that he was planning on tasking her with "some more work to bring her more in line with her peers." *Id.* at 4. On January 22, 2020, Kaufman told Polis that Weaver's "[p]erformance has been stable," and that he had "no further concerns at this time." *Id.* at 2. As a result, Polis "close[d]" the performance warning "for now," and asked Kaufman to "let [her] know if issues start to resurface." *Id.*

### 3.    2020–2021: Weaver's Second Manager

In June 2020, Aurora Achong, a Black woman, replaced Kaufman as Weaver's supervisor. JSF ¶ 11. Weaver had not previously worked with Achong. Weaver Dep. 136.

In early November 2020, a few months into her new role, Achong spoke with Hallie Bendell, another HR employee, to "share concerns" with Weaver's performance. Achong Decl. ¶ 3. In an email sent on November 16, 2020, Bendell wrote to Polis that Achong had told her about Weaver's "performance concerns," and the fact that Weaver "has gotten this feedback several times and still isn't demonstrating improvement." Polis Decl., Ex. 4 at 2. On November 19, 2020, Achong spoke with Polis to relay her concerns "with [Weaver] managing her projects independently, the quality of her work and her ability to exhibit basic presentation/Microsoft skills." *Id.*, Ex. 7 at 2. In that meeting, "[Polis] advised [Achong] to deliver a verbal warning to [Weaver] as she has been giving [Weaver] feedback for the past couple months." *Id.* at 3.

On December 8, 2020, Achong delivered a verbal warning to Weaver, which Achong memorialized in an email sent two days later. JSF ¶¶ 24–25. In the email, she reiterated the "key areas where improvement[] is needed," including "[i]mprov[ing] vendor and order management," "[i]mproving presence and action as a Global Lead," and "[r]esolv[ing]" issues without "relaying or deferring . . . to another team member." Polis Decl., Ex. 7 at 4. Achong

also reiterated that "immediate improvement must be seen and sustained as it pertains to the aforementioned areas." *Id.* After the meeting, Achong told a colleague that "[Weaver] didn't acknowledge the gaps in performance nor did she give any indication that she is dedicated to improving her performance." Achong Decl., Ex. 1 at 2.

In February 2021, Weaver met with Achong to discuss her 2020 year-end performance evaluation, pursuant to which she was placed on a second PIP. JSF ¶ 26. In the formal evaluation, Achong wrote to Weaver that the PIP served "as a warning to you regarding continuing areas of serious concern with your performance, as you are currently not meeting the expectations of your role." Garland Decl., Ex. 11 at 3. "For 2020," Achong concluded, "your results did not meet expectations and immediate improvement is required." *Id.* at 4. As in the prior PIP, Weaver was told that if she "fail[ed] to meet the expected levels of performance . . . [she] may be subject to further action, up to and including termination of [her] employment." *Id.* at 6. In their meeting, Weaver told Achong that she "did not believe the evaluation on [her] performance was accurate" and that Rios was "discriminating against [her]," to which Achong replied that "there was merit to what [Weaver] was saying." Weaver Dep. 156. In a separate meeting, Achong told Weaver that "[Rios] was actively trying to get rid of [her]" because Rios did not "like[] Black women." *Id.* at 294–95.

Stated concerns about Weaver's performance thereafter continued within and outside human resources. On March 2, 2021, Polis emailed fellow HR employee Jenkins, identifying Weaver as an "individual who we may move to termination [sic] in the next 1-3 months should we not see improvement." Polis Decl., Ex. 6 at 2, 4. On March 29, 2021, Achong met with Polis to report "moderate improvement" but that she "[n]eeded to see [Weaver's] performance through the end of April to see if something is sustained." *Id.*, Ex. 7 at 4. On May 4, 2021, Achong

again met with Polis, telling her that Weaver was "not meeting expectations," despite "[d]ecent

improvement" in some areas, and that she would "regroup" with Weaver "to make it clear that

she is not meeting expectations and termination may be the next step." *Id.* at 5.

On May 20, 2021, Achong again emailed Weaver to relay her concerns about her

performance. JSF ¶ 31. Achong told Weaver:

> Overall, you are still not meeting all the expectations of your role. As mentioned
> during your [Year End Evaluation]/written warning meeting, I need to see
> immediate and sustained improvement in your performance. Should I not see the
> necessary improvement in the near future then we may have to take further action
> up and including termination.

Garland Decl., Ex. 12 at 2. When Weaver discussed this email with Achong, she pointed out that

John Downs, Bloomberg's chief operating officer for network—and head of Weaver's

department—had recently given her "positive feedback" about the "leadership" Weaver was

taking on a particular project. Weaver Dep. 189–90. Achong "seemed surprised" and "didn't

say anything" in response. *Id.* at 189.

### 4. July 2021: Weaver Files a Complaint About Rios and Takes Medical Leave

In early July 2021, Weaver contacted Pamela Hutchinson, Bloomberg's head of diversity

and inclusion, to express her concerns about Achong's supervisor, Rios, a woman of Dominican

descent. According to employee "case-history" notes recorded in a Bloomberg HR database,

Weaver told Hutchinson that Rios is "Colorist": "a specific form of racism between [B]lack and

Dominican people." Myers Decl., Ex. 6 at 1. Weaver also told Hutchinson that "[w]henever she

asks for guidance" from Rios, "she is told . . . 'I can't tell you how to do your job.'" *Id.*

On July 13, 2021, Deborah Barker, another HR employee, spoke with Weaver about

Rios. *See id.* At this meeting, according to the "case-history" notes, Weaver "recoiled" from the

"statement she made to [Hutchinson] about 'colorism,'" given "the weight" of such an

accusation. *Id.* "She said she mentioned it because she feels like the behavior from [Rios] is personal and not professional"—that is, "that [Rios] seems not to like her personally," as opposed to "having real concerns over her performance." *Id.* When Barker asked Weaver "how involved [Rios] is in [evaluating] her performance," given that Weaver directly reported to Achong, not Rios, Weaver replied that Rios is "not very involved, but that she knows Aurora [Achong] is acting on [Rios's] direction." *Id.* Weaver compared her experience to "a white male on the team," who "was taken to lunch [when he started], onboarded with more training[,] and the difference was 'night and day.'" *Id.* at 2. Weaver told Barker that "she felt belittled [by Rios] in meetings and was once told openly 'do you even read the tickets before you update?'" *Id.*

On July 16, 2021, Barker interviewed Achong about Weaver's complaint. *See id.*, Ex. 5 at 1. Achong's statements—which are important to this decision—are memorialized in a Bloomberg HR database. Achong, a Black woman, told Barker that Rios's conduct "can be belittling," and that Rios and another senior colleague "try to make [Achong] feel like she isn't in the 'know' or connected to her team by suggesting things like 'how could you not know this?'" *Id.* at 2. Asked whether Achong "had ever witnessed any form of discrimination on the team by leadership," Achong "took a minute to think about it," and then responded that "it can appear that [Rios] may have issues with women of color with degrees." *Id.* Achong stated that Rios "does not have a degree and rolls her eyes whenever a woman of color discusses their education or experience," and "judges" women of color "more aggressively." *Id.* at 2–3. Achong also noted that "she witnesses [Rios] talking down, demandingly, to [Weaver]" and "to [herself]" but "does not speak this way to other women on the team." *Id.* at 3. Achong stated that she "feels sometimes like [Rios] is trying to sabotage her [*i.e.*, Achong's] leadership or play

8

[Weaver] against her." *Id.* Barker asked Achong whether "she personally believes, and not based on [Rios's] opinion, that Alison has performance issues," to which Achong replied, "[Y]es." *Id.* at 2. Weaver, Achong stated, "is really poor at giving updates on projects," and despite being on a PIP with "attainable" objectives, Weaver "still wasn't meeting expectations." *Id.*

On July 19, 2021, Weaver took a leave of absence from Bloomberg for medical reasons related to "the stress" of her workplace environment. Weaver Dep. 246.

On August 11, 2021, Barker emailed Bloomberg colleagues including from HR with what she termed "an update." Myers Decl., Ex. 7 at 1. She wrote that she had "what I need" and that she did not believe "I should speak with Miguelina [Rios]." On the basis of the discussions she had had, she explained, she "d[id] not see evidence of discrimination" or "harassment or anything legally concerning." *Id.* Rather, she stated, her conclusion was that Rios had "an abrasive and condescending communication style" and could benefit "from a professional coach" and "some very direct feedback." *Id.*

### 5. August 2021–December 2021: Weaver Returns to Work and is Terminated

On August 15, 2021, Weaver returned to work. Weaver Dep. 247–48.

On August 16, 2021, Polis contacted Achong to discuss Weaver's interim performance evaluation. Achong Decl., Ex. 4 at 2–3. Achong told Polis that Weaver is still "not making the targets" and asked for assistance on "how to plan for [her] improvement within the COMMs team." *Id.* at 2.

On August 31, 2021, Weaver received her 2021 interim performance evaluation from Achong. JSF ¶ 32. Achong wrote that despite "some improvement" by "the end of the first half of 2021," Weaver "has struggled to improve and sustain performance expectations outlined in

her Performance Improvement Plan issued in February 2021 and is still falling short of

performance expectations overall." Garland Decl., Ex. 14 at 2. "Two of six metrics" outlined in

the PIP "were not met," Achong wrote, and "none" of Weaver's assigned projects "were

proactively managed for timely success." *Id.* at 3–4. Weaver was again told that she "must

immediately progress to level of meeting all performance criteria and sustain the improved

performance." *Id.* at 7. "Should I not see the necessary improvement," Achong wrote, "further

action may be taken up to and including termination." *Id.*

On October 5, 2021, Polis met with Achong to discuss Weaver's progress and possible

termination. Although the record leaves her contributions to the meeting unclear, Rios was

"present during those discussions with HR" related to Weaver's termination. Achong Dep. 28.

In this meeting, Achong told Polis that Weaver's performance had not improved. Achong Decl.

¶ 12. As a result, on October 13, 2021, Polis prepared a Request for Termination ("RFT") to

authorize the termination of Weaver's employment at Bloomberg. Polis Decl. ¶ 10; *see also id.*,

Ex. 8 at 1. The RFT concluded:

> Weaver has continued to struggle to meet performance expectations, despite
> [Achong's] efforts to help her improve. As a result of [Weaver] not being able to
> improve performance to the level required for her role since February 2021, when
> a written warning was delivered to her, management would like to move forward
> with termination at this time.

*Id.* at 6. Bloomberg's HR and legal departments approved the termination. Polis Decl. ¶ 10.

On December 6, 2021, Achong and Polis met with Weaver to notify her of the decision to

terminate her employment. JSF ¶ 36. During the meeting, Achong told Weaver:

> [W]e've been working really closely with you . . . with the performance and getting
> it to a manner of an acceptable level. And at this time, the level that is required for
> the position hasn't been fully demonstrated for this role.

*Id.*

### B.     Procedural History

On September 26, 2022, Weaver filed the Complaint, bringing discrimination and

retaliation claims relating to race and disability under federal, state, and city law.  Dkt. 1.[2]  On

October 24, 2023, after discovery, Bloomberg filed a motion for summary judgment on all

claims, Dkt. 31, and a supporting memorandum of law, Dkt. 37 ("Def. Br.").  On November 21,

2023, Weaver filed her opposition.  Dkt. 43 ("Pl. Br.").  On December 5, 2023, Bloomberg filed

a reply.  Dkt. 45 ("Def. Reply Br.").

## II.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears the burden of demonstrating the absence of a question of material fact.  In

making this determination, the Court must view all facts "in the light most favorable" to the non-

moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  Rather, to survive a

summary judgment motion, the opposing party must establish a genuine issue of fact by "citing

---

[2] On September 12, 2023, the Court held a pre-motion conference.  Dkt. 29 (transcript of
conference).  At that conference, Weaver stipulated to the dismissal of all claims other than for a
racially discriminatory discharge (*i.e.*, hostile work environment, disability discrimination, and
retaliatory discharge).  *Id.* at 3–4.  The Court memorialized the dismissal of those claims in an
order issued the same day.  Dkt. 26.

to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in deciding whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, Inc., 445 F.3d 597, 603 (2d Cir. 2006). But "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Thus, even in such a case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

### III.   Discussion

Weaver alleges that Bloomberg terminated her because of her race, in violation of Title VII, the NYSHRL, and the NYCHRL.  The Court considers first Weaver's federal claim and then turns to her state claims.

### A.   Weaver's Title VII Claim

#### 1.   Legal Standard

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).

When there is no direct evidence of discrimination, discrimination claims under Title VII are guided by the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). At the first step of this analysis, the plaintiff must point to evidence in the record showing that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the position she held; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination based on plaintiff's membership in the protected class.  *Ruiz v. County of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).  Generally, the burden of establishing a *prima facie* case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  But a plaintiff cannot do so with "purely conclusory allegations of discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

If the plaintiff meets her burden at the first step, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981)). At that point, the burden of production shifts to the defendant, which must "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (quoting *McDonnell Douglas*, 411 U.S. at 802). The defendant's burden at this stage is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).

If the defendant meets that burden, at the third step the presumption of animus drops away, and the plaintiff must show that one of the reasons "for the adverse employment decision was discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003). "To defeat summary judgment within the *McDonnell Douglas* framework, . . . the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holtz*, 258 F.3d at 78 (internal quotation marks omitted) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

### 2.   Application

Weaver's disparate-treatment claim is that Bloomberg terminated her because of her race. The first three prongs of Weaver's *prima facie* case are undisputed on this motion. Weaver, a Black woman, is a member of a protected class. *See, e.g.*, *Sykes v. Mt. Sinai Med. Ctr.*, 967 F. Supp. 791, 796 (S.D.N.Y. 1997). Bloomberg does not challenge that Weaver was qualified for her position. *See, e.g.*, *Ruiz*, 609 F.3d at 492 ("qualified" prong requires only that the plaintiff adduce evidence she "possesses the basic skills necessary for performance of [the] job" (citation

omitted)); *cf.* Def. Br. at 15 (arguing only that Weaver's claims fail because her termination was "unrelated to race or color"). And Weaver experienced the paradigmatic adverse employment action: termination. *See, e.g., Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). That leaves the fourth *prima facie* prong: whether Weaver was terminated because of her race. The parties dispute whether she has adduced the minimal proof necessary to make out a *prima facie* case of discriminatory discharge. *Compare* Def. Br. at 19–21, *with* Pl. Br. at 5–8.

At this stage of the litigation, however, there is little to be gained in assessing whether Weaver can make out a *prima facie* case, as opposed to focusing on the third step of the *McDonnell Douglas* analysis. "[J]udicial inquiry into the *prima facie* case is usually misplaced" on motions for summary judgment. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.); *see also Howard v. MTA Metro N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases). The *prima facie* burden is, after all, "*de minimis.*" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). And once the employer has come forward with evidence sufficient to show "a legitimate, nondiscriminatory reason" for the adverse action—as Bloomberg has done here in pointing to Weaver's contemporaneously documented workplace performance issues—"the presumption" of discrimination "raised by the *prima facie* case is rebutted and drops from the case." *Hicks*, 509 U.S. at 507 (cleaned up). The sole remaining issue is whether a reasonable jury could find that a "reason for the [termination] was discrimination." *Mandell*, 316 F.3d at 381; *see also, e.g., Burdine*, 405 U.S. at 253 (plaintiff must adduce evidence to satisfy her "ultimate burden of persuading the trier of fact" that she was "intentionally discriminated against"). In that inquiry, "the evidence establishing the plaintiff's *prima facie* case" remains relevant, *Reeves*, 530 U.S. at 143, but the mere fact that a *prima facie* case had been found would not.

The parties' dispute at the third step thus boils down to this question: Would the record evidence permit a reasonable factfinder to find that Weaver was terminated because of her race? This inquiry focuses on the employer's *actual* motives. *E.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 394 n.15 (1977). Under Title VII, "an action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Vega*, 801 F.3d at 85; *see also, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) ("[A] plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" (quoting 42 U.S.C. § 2000e-2(m))). In other words, the "'ultimate issue' in an employment discrimination case" like this "is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least *in part* by an 'impermissible reason,' *i.e.*, a discriminatory reason." *Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997) (citation omitted) (emphasis added).

The Court finds that Weaver has adduced sufficient evidence that she was terminated because of her race to survive summary judgment. Weaver's claim centers on Rios. Weaver contends that Rios, motivated by racial animus, causally participated in her termination. Pl. Br. at 6–10. "Evidence of discriminatory statements or attitudes on the part of the" relevant decisionmaker can demonstrate that an adverse employment decision was made "for a discriminatory reason." *Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) (cleaned up); *see also, e.g., Edrisse v. Marriott Int'l, Inc.*, 757 F. Supp. 2d 381, 389–90 (S.D.N.Y. 2010) (denying summary judgment in employment discrimination case where reasonable factfinder could conclude that (1) one of plaintiff's supervisors "harbored animus towards Arabs and

Muslims" and (2) the supervisor "played a meaningful role in [defendant's] decision to suspend plaintiff without pay"). The summary judgment question thus is usefully analyzed in two parts: Does the admissible evidence permit a jury to find that Rios harbored racial animus towards Weaver? And does such evidence permit a jury to find that Rios participated in the decision to terminate Weaver? The Court considers each question in turn.

a.    *Evidence of Rios's racial animus against Weaver*

As evidence of Rios's racial animus, Weaver relies on statements that her mid-level manager, Achong, made about Rios's views about, and her treatment of, women of color.

Critically, Achong's statements were not made in the abstract. Most were made during HR's July 2021 interview of her occasioned by Weaver's pre-termination claim that Rios was racially biased against her. Achong's statements to HR were recorded as "interview notes" in a Bloomberg's internal system. Given the centrality of this evidence, the Court quotes the relevant excerpt in full:

> Separate from [Weaver's] performance, Deb [Barker] asked if Aurora [Achong] had ever witnessed any form of discrimination on the team by leadership. [Achong] took a minute to think about it. She said it can appear that Miguelina [Rios] may have issues with women of color with degrees. She said Miguelina [Rios] does not have a degree and rolls her eyes whenever a woman of color discusses their education or experience. Aurora [Achong] said Miguelina [Rios] does not do this to John [Downs] or men on the team. She said she seems to look at women of color with a finer lens and judges them more aggressively. It appears Miguelina [Rios] wants to be the only or best woman of color. Whenever other women of color discuss experience, Miguelina [Rios] will quickly say things like "I have 25 years of work experience at Bloomberg which is what matters." She also references the fact that her husband (Adrian Rios) works at Bloomberg as well and gives off the vibe that she is "protected." . . . Aurora [Achong] said whenever any of this is raised to Miguelina [Rios] in some way, she is dismissive and somewhat "gaslights" by saying she has no idea what they are talking about. Aurora [Achong] advised that she witnesses Miguelina [Rios] talking down, demeaningly, to Alison [Weaver], herself and Obioma [Richardson], but does not speak this way to other women on the team like Mathi K (Miguelina's peer) [and] Leah Beyen (not a peer). Aurora [Achong] also said that Miguelina [Rios] tends to provide mixed direction. She will tell Aurora [Achong] she is going to give Alison [Weaver] a certain

direction, but then gives her a different steer.  She said it feels sometimes like she is trying to sabotage her leadership or play Alison [Weaver] against her.  She said she does the same thing with Obiama [Richardson]. . . .  Aurora [Achong] said that Miguelina [Rios] speaks to her condescendingly and with a petty tone but does not speak like this to white men.

Myers Decl., Ex. 5 at 2.

Viewing these statements in the light most favorable to Weaver, Achong, speaking in an employment setting lending itself to measured answers, accused Rios of "hav[ing] issues with women of color with degrees," like herself and Weaver, and of treating women of color different from other employees.  *Id.*  Achong told HR that Rios "look[s] at women of color with a finer lens and judges them more aggressively" and that Rios "wants to be the only or best woman of color" at Bloomberg.  *Id.*  Achong further reported that she had "witnesse[d] [Rios] talking down, demeaningly, to [Weaver], herself[,] and Obioma [Richardson]," a Black employee with whom she worked.  *Id.*  Rios, Achong added, "speaks to her condescendingly and with a petty tone but does not speak like this to white men," or, indeed, "to other women on the team."  *Id.*

To be sure, in her deposition, Achong testified that she does not recall making some of the statements she is recorded as having made in the HR interview.  In the deposition, Achong appears to have distanced herself from, or contextualized, other such statements.[3]  The Court therefore assumes that, at trial, Achong would not testify about Rios consistent with the more damaging statements memorialized in the HR interview.

---

[3] When asked in the deposition whether she had told Barker that Rios "was saying they needed to move [Weaver] off the team if she couldn't improve," Achong replied, "I don't recall saying it like that, no."  Rios Dep. 47.  And when asked whether she had told Barker that Rios "does not do this to John or men on the team," she replied, "I might not have said it that exact way, no."  *Id.* at 50.  Achong further stated in the deposition that the statements she had made about Rios related to "how [she] felt [she] was treated" and were not observations based on Rios's relationships with "any other women of color."  *Id.*

18

For purposes of summary judgment, however, the Court assumes that Achong's statements to HR would be admissible for the truth of the matters asserted.  The Court does so for two reasons.

First, in pursuing summary judgment, Bloomberg has not argued that Achong's statements in the HR interview would be inadmissible at trial, or admissible for limited purposes only.  "If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials [at summary judgment] are deemed to have been waived."  *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); *see also Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]ncertified or otherwise inadmissible documents may be considered by the court [at summary judgment] if not challenged.  The objection [to their admissibility] must be timely or it will be deemed to have been waived." (citation omitted)).

Second, although admissibility at trial has yet to be litigated and may require a statement-specific analysis, there are sound reasons to conclude that, in general, Achong's statements about Rios, as memorialized in Bloomberg's records, would be admissible for the truth, as statements of a Bloomberg employee within the scope of her employment, under Federal Rule of Evidence 801(d)(2)(D).[4]

---

[4] Because the internal report containing Achong's statements is itself an out-of-court assertion (*i.e.*, sought to be admitted for the truth of the matter asserted that Achong in fact said *x*, *y*, and *z*), the report itself must also satisfy an exception to or an exclusion from the rule against hearsay.  Fed. R. Evid. 805.  On the record at hand, the report appears to fall squarely within the business-records exception of Rule 803(6), as it was created pursuant to Bloomberg's "[p]rotocol[]" requiring interviewers to "take notes" for investigative purposes and thereafter maintained, presumably pursuant to a similar protocol.  Myers Decl., Ex. 5 at 1; *see also, e.g., Accely v. Consol. Edison Co. of N.Y., Inc.*, No. 19 Civ. 5984 (DC), 2023 WL 3045795, at *2–4 (S.D.N.Y. Apr. 20, 2023) (report of defendant's HR staff admissible under business-records

Under Federal Rule of Evidence 801(d)(2)(D), statements "by the party's agent or employee on a matter within the scope of that relationship and while it existed" are admissible as non-hearsay. As the Second Circuit has explained, a declarant "need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement" for the statement "to be deemed within the scope of his agency." *United States v. Rioux*, 97 F.3d 648, 661 (2d Cir. 1996). Here, per Achong herself, she was responsible for "assess[ing]" Weaver's "performance," "would discuss" and share "feedback" with Rios as to the same, and was "involved in the decision" to terminate Weaver. Achong Dep. 17–19. When Achong spoke with HR, she did so as a Bloomberg employee, in the context of a formal interview designed to investigate the basis (or lack thereof) for a complaint lodged by her immediate subordinate (Weaver) regarding her supervisor (Rios). *See, e.g., Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1213–15 (10th Cir. 2022) (statement of mid-level manager to internal investigator as to motives and racial prejudice of senior manager held admissible given that "report[ing] [such] information up the chain of command" and "act[ing] as a communication channel" was among manager's duties); *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 297–99 (3d Cir. 2007) (statement of mid-level manager to subordinate as to employer's "attitude toward employees giving adverse testimony" held admissible given that mid-level manager's role was to counsel and guide his direct reports); *Simple v. Walgreen Co.*, 511 F.3d 668, 671–72 (7th Cir. 2007) (statement of mid-level manager to subordinate as to motives and racial prejudice of senior manager held admissible because conveying his "understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like" formed part of the mid-level

---

exception, with employees' embedded statements admissible as party-opponent admissions, and collecting cases to same effect).

manager's role).  There is thus good reason to believe that, in general, Achong's observations and assessments in the HR interview about Rios's conduct and motivations will be attributable to Bloomberg at trial.

Independent of Achong's statements to HR, Achong also—according to Weaver's deposition testimony—made statements in the workplace to Weaver indicative of an animus to Weaver as a Black woman.  During a performance review in February 2021, Weaver testified, Achong told her "there was merit" to Weaver's view that Rios's "evaluation on [her] performance was [not] accurate" and that Rios was "discriminating against [her]."  Weaver Dep. 156.[5]  Separately, Weaver testified, at some time in 2020 or 2021, during one of their weekly check-in meetings, Achong told Weaver that "[Rios] was actively trying to get rid of [Weaver]" because Rios did not "like[] Black women."  Weaver Dep. 294–95; *see also id.* at 292 (noting

---

[5] Bloomberg attempts to undermine this testimony, contending that Weaver admitted in her deposition "that *she did not recall* what Achong said to her during the meeting."  Def. Reply Br. at 7 (emphasis in original) (citing Weaver Dep. 155).  Bloomberg misstates Weaver's testimony. In the pertinent portion, Weaver testified as follows:

> A.   I think I said [to Achong] that [Rios] was discriminating against me.
>           . . .
> Q.   As specifically as you can recall your words, what did you say to Miss Achong?
> A.   That I did not believe the evaluation on my performance was accurate or rooted in my professional abilities that I believe.
> Q.   What, if anything, did Miss Achong say in response?
> A.   That she believed there was merit to what I was saying.
> Q.   Did she say anything else about that subject during that meeting?
> A.   She did.
> Q.   What did she say?
> A.   I can't recall specifically.

Weaver Dep. 156.  Weaver's inability to "recall specifically" what *else* was said "about that subject" cannot be read to retract her immediately prior testimony that Achong had stated that she believed there was merit to the claim that Rios was discriminating against Weaver.

that Weaver and Achong "met once a week for [Achong] to look over [Weaver's work] and give [Weaver] any feedback [Achong] thought was necessary").

There is authority under which these statements, too, would likely be admissible under Rule 801(d)(2)(D) for the truth of the matters asserted by Achong. "Direct warnings by [a] plaintiff's immediate supervisor, [herself] a member of management, given to the plaintiff, [her] subordinate, as to the attitude, intentions and/or policy of the higher-ups in management are admissible under Rule 801(d)(2)(D)." *Marra*, 497 F.3d at 298 (cleaned up); *see also, e.g.*, *Talavera v. Shah*, 638 F.3d 303, 310 (D.C. Cir. 2011) ("direct warnings" about the "attitude" and "gender bias" of "a management official [the declarant] supervised" held admissible); *Carter v. Univ. of Toledo*, 349 F.3d 269, 272, 274 (6th Cir. 2003) (direct warnings to visiting professor by vice provost that university's decisionmakers were "a bunch of racists" and "trying to get rid of the black professors" held admissible); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1094 (1st Cir. 1995) (direct warnings about the fact that management "want younger people here" held admissible). That the statements are detrimental, not helpful, to Bloomberg's interests does not impede their admission under Rule 801(d)(2)(D). *Cf., e.g.*, *United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) ("[F]ew principals employ agents for the purpose of making damaging statements." (citation omitted)).

Achong's statements about Rios's attitudes and workplace conduct, including towards Weaver, would supply a sufficient basis for a reasonable juror to find that she harbored animus towards Black woman.[6] Such a juror could readily conclude that Achong—situated in between

---

[6] Although both parties rely on the *McDonnell Douglas* burden-shifting framework to gauge whether the evidence would permit a reasonable juror to infer that Weaver's termination was the product of racial animus, intentional discrimination may also be established by direct evidence. *See Schiano*, 445 F.3d at 603. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Cruz*, 42 F.4th at 1216. The

Rios and Weaver in the network communications team—was a percipient witness well situated to recount Rios's conduct and statements and to render a reliable lay opinion about her racial attitudes.[7] Such a juror could thus also conclude that Rios in fact "look[ed] at women of color with a finer lens and judge[d] them more aggressively" and had sought to "get rid of" Weaver specifically, based on Weaver's race.

Bloomberg's arguments to the contrary are not without force. *See, e.g.*, Def. Reply Br. at 5–6 (terming Achong's interview statements to HR "conclusory," lacking a "factual foundation," and contradicted by Achong's later deposition testimony). But these go to the weight of this evidence, and thus are properly resolved at trial.[8] As the Second Circuit explained in *Danzer v. Norden Systems, Inc.*, 151 F.3d 50 (2d Cir. 1998):

> In discrimination cases, the only direct evidence available very often centers on what the defendant allegedly said or did. Since the defendant will rarely admit to

---

Court does not have occasion here to resolve whether Achong's statements could be found to be direct evidence of discrimination. The argument in favor would be that "the substance of the comment[s] illustrate[] a discriminatory motive," and that the "context and timing" of the comments were also "closely linked with the adverse decision." *Id.* at 1216–17 (statement by hiring manager, prior to employment decision, that he did not "want . . . some crazy brown man running around with a gun" held direct evidence of discrimination).

[7] Personal knowledge is not required for a declarant-employee's statements to be used against her employer. *Pappas v. Middle Earth Condo. Assoc.*, 963 F.2d 534, 537 (2d Cir. 1992); *see also* 6 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 801:24 (9th ed., Nov. 2023 update); 5 WEINSTEIN'S FEDERAL EVIDENCE § 801.33 (2d ed., 2024 update). However, because courts have required "some kind of participation in the employment decision or policy of the employer" at issue, *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1209 (11th Cir. 2013) (collecting cases), it is not the case that all statements by an employee are admissible under Rule 801(d)(2)(D) solely by virtue of her employment. *Cf., e.g.*, *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 999–1001 (9th Cir. 2019) (discussing how the "scope" of an employee's agency varies based on their function and managerial level).

[8] In claiming that Achong's "opinion . . . cannot defeat a motion for summary judgment," Def. Reply Br. at 6, Bloomberg relies on *Westcott v. Pepsi Bottling Co. of New York*, 07 Civ. 2410 (BMC), 2008 WL 11438078 (E.D.N.Y. May 9, 2008). *Westcott* is easily distinguished. The plaintiff there based his opposition to summary judgment on his coworkers' affidavits that "African-Americans at Pepsi are treated worse than non-African Americans at Pepsi." *Westcott*,

> having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.
>
> At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant. To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because "self-serving") insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits. Such a radical change in the courts' role would be inappropriate not just in the discrimination context, but everywhere.

*Id.* at 57 (internal citations and quotation marks omitted). Bloomberg will be free to argue to the jury that it should discount Achong's statements, including on the grounds that Achong had limited visibility into Rios's role in the decision to terminate Weaver, and that Achong has since retreated from her condemnations of Rios. *See Marra*, 497 F.3d at 299. But "it is the finder of fact, not the district court ruling on summary judgment, who must determine the weight and credibility to accord" such evidence. *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 80 (2d Cir. 2016). A reasonable juror could conclude that Rios harbored racial animus against Weaver.

b.    *Evidence of Rios's participation in Weaver's termination*

To prevail, Weaver must also offer admissible evidence that the allegedly biased supervisor—Rios—participated in the decision to terminate her employment. *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001); *see also, e.g., Dister v. Cont'l Grp., Inc.*,

---

2008 WL 11438078, at *5. Such "conclusory opinions," the district court held, could not "support an inference of disparate treatment," as the affidavits said "nothing at all about specific instances—what these witnesses have seen, heard, and done." *Id.* The *Westcott* affidavits are a far cry from Achong's statements to HR, and to Weaver, here. Those affidavits were prepared solely for the purpose of litigation, and thus could not be held admissions of the defendant corporation. And they were factually disconnected from the controversy at hand. Not so here: Achong's assessments about Rios's racial animus were made in real time in the course of her job duties. And they concerned her immediate supervisor's treatment of her direct report. Even if Rule 701 applied—and it does not where a statement is admissible under Rule 801(d)(2)(D), *see Southland Corp.*, 760 F.2d at 1376 n.4 (1985)—Weaver would have a far more substantial argument than in *Westcott* that the relevant statements were "rationally based on the witness's perception." Fed. R. Evid. 701.

859 F.2d 1108, 1114 (2d Cir. 1988). Bloomberg argues that Weaver has not "come forward with

any evidence that Rios played a role in the decision to terminate her employment." Def. Reply

Br. at 11.

That is wrong. Drawing all reasonable inferences in Weaver's favor, a factfinder could

conclude that Rios played *some* role in her termination. The deposition testimony of Rios and

Achong would sustain such a finding. Rios denied having "ma[d]e the recommendation to

terminate Ms. Weaver," but she acknowledged having spoken "with Ms. Achong about

terminating Ms. Weaver," and having had "[p]lenty" of conversations with Achong about "Ms.

Weaver not meeting expectations." Rios Dep. 27, 42. Rios further testified that the "last

conversation" she had with Achong about Weaver's performance "was along the lines of: She's

not meeting expectations and HR has recommended we can move forward with the termination."

Rios. Dep. 27–28. For her part, Achong testified that Rios was "present during those discussions

with HR" related to Weaver's termination, and that Achong frequently spoke to Rios about

"[e]very team member's performance." Achong Dep. 14, 28. A reasonable jury could find that

Rios's presence in critical meetings relating to the termination, and her negative input about

Weaver to her direct report Achong, who supervised Weaver, helped bring about the decision to

terminate Weaver. To be sure, a reasonable jury could find the opposite—that the influence Rios

exerted was too slight to qualify as a motivating factor in the termination decision. But on

summary judgment, the Court must view the evidence in the light most favorable to non-movant

Weaver, not to movant Bloomberg.

Bloomberg points to the well-chronicled evidence of Weaver's performance deficiencies

and the evidence that Achong, more than Rios, drove the termination decision. Def. Reply Br. at

8–9. But Title VII does not require but-for causation, a standard under which termination-

worthy performance deficiencies by Weaver might be held to preclude discrimination liability.

*Cf., e.g., Hicks*, 509 U.S. at 515 (under but-for causation, "a reason cannot be proved to be 'a

pretext for *discrimination*' unless it is shown *both* that the reason was false, *and that*

discrimination was the real reason" (emphasis in original)).   Liability under Title VII instead

attaches if race was a "'substantial' or 'motivating' factor" in the employment decision at issue.

*Vega*, 801 F.3d at 85.   Thus, "the plaintiff is not required to show that the employer's proffered

reasons were false or played no role in the employment decision, but only that they were not the

only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holtz*,

258 F.3d at 78 (internal quotation marks omitted) (quoting *Cronin*, 46 F.3d at 203); *see also*,

*e.g., Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013).   A reasonable factfinder

here could credit both (1) the assessment of Achong and others that Weaver had large

performance issues and (2) that Rios's racial animus also motivated the termination decision.

*See, e.g., Walsh*, 828 F.3d at 79–80 (denying summary judgment to defense in sex discrimination

in hiring case, despite uncontroverted evidence of other candidates' superior qualifications,

where plaintiff alleged that defendant's employee told her that management "wanted somebody

stronger").

The Court thus denies Bloomberg's motion for summary judgment as to Weaver's Title

VII claim.

## B.      Weaver's Claims Under State and City Law

Weaver also brings claims under the NYSHRL and the NYCHRL.   Title VII acts as a

"floor" for both statutes.   *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)

(citation omitted); *see also, e.g., Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 552–53

(S.D.N.Y. 2023).   Because Weaver has adduced sufficient evidence for her Title VII claims to

survive summary judgment, her parallel claims under state and city law also necessarily survive. *See, e.g.*, *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020); *Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734 (DLC), 2020 WL 1812741, at *7 (S.D.N.Y. Apr. 9, 2020); *Levy v. Legal Aid Soc'y*, 408 F. Supp. 3d 209, 217 (E.D.N.Y. 2019).  The Court thus also denies Bloomberg's motion for summary judgment as to Weaver's claims under state and city law.

## CONCLUSION

For the foregoing reasons, the Court denies Bloomberg's motion for summary judgment. This case will now proceed to trial.  An order will issue shortly setting a deadline for the parties' joint pretrial order, to be completed consistent with the Court's Individual Rules governing jury trials.  The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 20, 2024
　　　New York, New York

27